UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
VOGSTER ENTERTAINMENT, L.L.C.,

                Plaintiff,

- against -

GARY MOSTOVOY, MIKHAIL VAYSMAN
and JOHN DOES 1-5,

                Defendants,
    and

eNom.com, NameCheap.com, Register.com,
Hostgator.com, LLC and iGenii, Inc. d/b/a
Majesticdns,

                Nominal Defendants.
-----------------------------------------------------------X

**MEMORANDUM &
TEMPORARY RESTRAINING ORDER**

09-CV-1036 (RRM)(RER)

MAUSKOPF, United States District Judge.

Plaintiff Vogster Entertainment, L.L.C., a New Jersey entity, commenced this action on March 12, 2009 by filing a Complaint as well as an ex parte motion for a Temporary Restraining Order and/or Preliminary Injunction against the New York Defendants, Gary Mostovoy and Mikhail Vaysman (Mostovoy and Vaysman are referred to collectively as "Defendants"). Plaintiff alleges Defendants' violations of the anticybersquatting provision of the Lanham Act, 15 U.S.C. §§ 1125(d) et seq., as well as related and independent violations of New Jersey statutory and common law. An ex parte hearing was held on the record on March 13, 2009. For the reasons set forth below, and for the reasons set forth on the record at the March 13th hearing, Plaintiff has established the need for issuance of Temporary Restraining Order without notice, including immediate and irreparable injury, loss, or damage. Plaintiff's motion for a Temporary Restraining Order against Defendants is therefore GRANTED.

## FACTS

Pursuant to Federal Rule of Civil Procedure 65(b), Plaintiff's motion is supported by a Memorandum of Law, the Declaration of Mark J. Rosenberg, Esq., and the Declaration of Vogster's President, Tamara Dunaev, sworn March 11, 2009. Pursuant to the Plaintiff's submissions, and on the basis of the March 13, 2009 hearing, the Court finds, for purposes of this Order, as follows:

New Jersey-based Vogster is a technology company in the business of developing and publishing computer games and other interactive products. Since 2006, Vogster has used its "Vogster" mark in connection with offering, marketing and promoting its goods through, among other things, appearances at trade shows, internet and print advertising, and its popular website: www.vogster.com.

Vogster's products were promoted and sold its products under marks currently pending registration before the United States Patent and Trademark Office ("USPTO"),[1] including "Vogster," "Robocalypse," "Crimecraft," and "Unbound Saga" (collectively, the "Vogster Marks").[2] The related websites for those products include, but are not limited to: www.vogster.com, www.robocalypse.com., www.unboundsaga.com, and www.crimecraft.com (collectively, the "Vogster websites"). The Vogster websites, together with the following Vogster-related domain names, form the subject of this cybersquatting dispute: vogster.com; vogster.co.uk; vogster.info; vogster.mobi; vogster.net; vogster.org; vogster.org.uk; vogster.tv; vogster.us; vogsteraward.com; vogsterawards.com; vogster.biz; crimecraft.biz; crimecraft.co.uk;

---

[1] Plaintiff represents that the following USPTO applications have been filed with respect to the Vogster Marks: "Vogster" No. 77/030128 of Oct. 26, 2006; "Crimecraft" No. 78/844321 of Mar. 23, 2006; "Robocalypse" No. 77/405823 of Feb. 26, 2008; "Unbound Saga" No. 77/496801 of June 11, 2008. The "Helldiver" mark, which is under license to Vogster, is represented to be covered by application No. 77/460003.

[2] One additional mark – "Helldiver" – is owned by a third party, from which Vogster has obtained licensing rights.

crimcraft.com; crimecraft.info; crimecraft.mobi; crimecraft.net; crimecraft.org; crimecraft.org.uk; crimecraft.tv; crimecraft.us; crimecraftgame.com; robocalypse.com; robocaplypse.us; robocalypsegame.com; unboundsaga.com; and helldiver.com (collectively, the "Vogster domain names").

Defendant Mostovoy, a resident of Brooklyn, New York, was Vogster's co-owner and former employee. During his tenure with Vogster, Mostovoy was responsible for, among other things, acquiring, registering and administering the Vogster websites and domain names – for which he used Vogster's resources and funds. Rather than create and register domain names on Vogster's behalf, it appears that Mostovoy instead registered all or many of the Vogster websites and domain names (or confusingly similar domain names containing Vogster's distinctive marks, referred to as "Vogster-related domain names") in his personal name.[3] Plaintiff contends that this was done improperly without its authorization or knowledge.

On February 6, 2009, Mostovoy resigned from Vogster amidst separate and unrelated allegations that he had misappropriated Vogster's funds and resources to his own purposes. In connection with his resignation, Mostovoy sold his ownership interest in Vogster back to the Company, and agreed to transfer and assign to Vogster and otherwise renounce any and all rights he held in Vogster's property, including, among other things, the Vogster domain names, websites, trademark rights and email addresses. This understanding was memorialized in a Sale Purchase Agreement dated February 6, 2009 and a Letter Agreement also dated February 6, 2009. Both agreements are appended as exhibits to the Dunaev Declaration. Despite these agreements, it appears that registration of or access to the Vogster websites and domain names

---

[3] Additionally, documentary evidence indicates that several Vogster or Vogster-related domain names have been registered anonymously; i.e., the registrant has paid a fee to prevent his identity from appearing on public searches for registrant information. Plaintiff argues that anonymous registration of these domain names is consistent with Defendants' deceptive, bad-faith conduct.

has not been returned, and access to them remains either within Mostovoy's possession, custody and control, or has been unlawfully transferred to Defendant Mikhail Vaysman. From the documentary evidence, it appears that Defendant Vaysman, a Brooklyn resident, is Mostovoy's friend, relative or associate.

Since learning that the Vogster websites and domain names were registered to Mostovoy and/or Vaysman, Vogster has requested that Mostovoy comply with his contractual obligations to return access to those assets by transferring all registration rights to Vogster. Mostovoy, however, has ignored those requests and remains in possession of the usernames and passwords necessary to exercise control over Vogster's websites and domain names.

From the evidence presented, it appears that there is not, and never has been, a legitimate reason for either Mostovoy or Vaysman to register or transfer the Vogster websites and domain names to themselves. Further, from documentary evidence as recent as early March 2009, it appears that Mostovoy continues to improperly register and/or transfer Vogster websites and domain names (either to other registrants or to other registrars), despite being aware of Vogster's claims to the exclusive ownership and control of those assets.

Pursuant to, the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. §1125(d), Plaintiff seeks to temporarily restrain Mostovoy and Vaysman, without notice, from, among other things, further transferring registration rights or otherwise accessing the Vogster websites and domain names.

## JURISDICTION

Jurisdiction is predicated upon 15 U.S.C. § 1121(a), which provision provides original jurisdiction in the district courts for all actions arising under the Lanham Act, including claims arising under 15 U.S.C. § 1125(d), its anticybersquatting provision. See Freedom Calls Found.

v. Bukstel, No. 05-CV-5460, 2006 WL 845509, at *4 (E.D.N.Y. Mar. 3, 2006). The Court has jurisdiction over Plaintiff's various State law claims pursuant to its supplemental jurisdiction, 28 U.S.C. § 1367.

## DISCUSSION

### I.

### MOSTOVOY AND VAYSMAN

In order to obtain a temporary restraining order, Plaintiff must demonstrate that (i) the order is necessary to prevent irreparable harm, and (ii) that Plaintiff is likely to succeed on the merits of its claims or that there are sufficiently serious questions going to the merits of the claims to make them a fair ground for litigation, with a balance of hardships tipping decidedly in Plaintiff's favor. See Fed. Express Corp. v. Fed. Espresso, Inc., 201 F.3d 168, 173 (2d Cir. 2000); Freedom Calls, 2006 WL 845509, at *4. In order to obtain such relief ex parte,

> (1) It must clearly appear from specific facts shown by affidavit ... that immediate and irreparable injury will ... result to the [Plaintiff] before the adverse party ... can be heard in opposition and (2) the [Plaintiff's] attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

Fed. R. Civ. P. 65(b); Bridges Network, Inc. v. Rafiq, No. 06-CV-0031E, 2006 WL 145912, at *2 (W.D.N.Y. Jan. 19, 2006).

### A. Good Cause for Excusing Notice

Plaintiff has demonstrated sufficient cause to make this motion ex parte. The supporting documentary evidence indicates that, since being placed on notice of Vogster's ownership claim to the Vogster websites and domain names, Mostovoy has undertaken to further transfer registration of certain of those websites and domain names. In some cases, it appears that he has transferred the registrant name from himself to Vaysman and, in others, that he has transferred

5

domain names from one internet registrar to another. For obvious reasons, the continued transfer of registrants and/or registrars complicates the task of identifying and locating relevant registration information concerning Vogster's websites and domain names. At the very least, it appears to constitute what Plaintiff characterizes as a "shell game," and suggests an intent to deceive sufficient to justify proceeding without notice. Moreover, given the sensitive nature of the interests at stake and Defendants' ability to immediately disrupt Vogster's business, as discussed below, Plaintiff has demonstrated the irreparable injury, loss or damage that Rule 65(b) requires.

## B. Likelihood of Success on the Merits

Plaintiff's Complaint asserts eleven causes of action against Defendants, only three of which serve as the basis for Plaintiff's instant motion for temporary and preliminary injunctive relief: (1) cybersquatting/ cyber-piracy, 15 U.S.C. § 1125(d)(1)(A), as against Mostovoy and Vaysman; (2) breach of contract as against Mostovoy; and (3) breach of fiduciary duty, also as against Mostovoy. For the reasons discussed below, Plaintiff has established a likelihood of success on each of these claims sufficient to warrant temporary injunctive relief.

### a. Cybersquatting/ cyber-piracy under ACPA

ACPA was intended to prevent cybersquatting, an expression that has come to mean the bad faith, abusive registration and use of the distinctive trademarks of others as internet domain names, with the intent to profit from the goodwill associated with those trademarks. Sporty's Farm, L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 495 (2d Cir. 2000).

§1125(d)(1)(A), provides in relevant part:

> A person shall be liable in a civil action by the owner of a mark ... if, without regard to the goods or services of the parties, that person
>
> (i) Has a bad faith intent to profit from the mark ...; and

>       (ii)    Registers, traffics in, or uses a domain name that -
>               (I)     in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; [or]
>               (II)    In the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark[.]

For purposes of establishing ACPA liability against Defendants, Vogster has presented evidence sufficient to demonstrate that (1) its marks are distinctive, (2) the infringing domain names complained of are identical to or confusingly similar to Vogster's marks, and (3) Defendants likely acted in bad faith. See Sporty's Farm, 202 F.3d at 497-99; Kuklachev v. Gelfman, --- F.Supp.2d ----, No. 08-CV-2214, 2009 WL 497628, at *21 (E.D.N.Y. Feb 26, 2009).[4]

As a threshold matter, this Court agrees with Plaintiff, that the Vogster marks, which appear to include a host of fanciful names, including "Vogster" and "Robocalypse," are

---

[4] In Kuklachev, the court recently declined to dismiss a cybersquatting claim, finding the elements of that claim adequately pled on facts similar to those presented here. In Kuklachev, a former employee of the "Moscow Cats Theater" had, as the plaintiff's employee, registered the domain name moscowcatstheater.com. There was no dispute that at the time the defendant registered that domain name, he was properly authorized to do so, and that the domain name was used to advertise the plaintiff's business. Upon his separation from the plaintiff, however, the defendant used his access to moscowcatstheater.com to advertise his competing venture. Rejecting a proposed defense that the initial registration of domain name had not been in bad faith, the court held that "Congress intended the cybersquatting statute to make rights to a domain-name registration contingent on ongoing conduct rather than to make them fixed at the time of registration." Kuklachev, 2009 WL 497628 at *21. Accordingly, the court held that the defendant's bad faith had been sufficiently alleged as required by ACPA.

sufficiently distinctive and recognizable as to warrant ACPA protection.[5] See Sporty's Farm, 202 F.3d at 497-99. Second, there is no dispute that the Vogster domain names, which Vogster complains have essentially been "hijacked," are identical to the Vogster Marks now pending USPTO registration (e.g., "vogster.com," "robocalypse.com," etc.) or that they otherwise contain the Vogster Marks with the mere addition of the words "award," "awards," or "game" (e.g., "vogsterawards.com," etc.). Finally, there is ample evidence that Defendants have misappropriated those marks in bad faith with intent to capitalize or otherwise interfere with Vogster's goodwill and reputation, as described in §1125 (d)(1)(B)(i). See Kuklachev, 2009 WL 497628, at *21; Freedom Calls, 2006 WL 845509, at *13-14.

With respect to the bad faith necessary to obtain temporary or preliminary injunctive relief, Vogster has demonstrated that:

1) Defendants have no trademark or intellectual property rights in the Vogster websites or domain names;

2) Defendants did not have such rights prior to registering the Vogster websites or domain names;

3) the Vogster websites or domain names do not consist in any way of the legal name of either Defendant;

---

[5] The Vogster Marks meet the rigorous criteria laid out in § 1125(c)(1), requiring the requisite degree of fame and/or distinctiveness sufficient for ACPA protection. See Nabisco Brands, Inc., v. PF Brands, Inc., 191 F.3d 208, 216 (2d Cir. 1999) (scope of Lanham Act protection for famous or distinctive marks generally). In this case, the Vogster Marks (1) are fanciful and arbitrary names, in that they do not "communicate any information about the product, either directly or by suggestion (see, Dudley v. HealthSource Chiropractic, Inc., 585 F. Supp. 2d 433, 438 (W.D.N.Y. 2008)); (2) have been used by Vogster for an extended period of time, (the Vogster mark, for example, has been in use since 2006); (3) have had millions of dollars in advertising spent to develop and promote them; (4) are used nationwide; and (5) are traded in a wide variety of retail channels. Sporty's Farm, 202 F.3d at 497. Robocalypse, for example, appears to be a well known title, having sold thousands of units worldwide for the popular Nintendo DS game system, while Vogster's Crimecraft and Unbound Saga games are represented to be in final development, with significant advertising dollars invested to promote the games in commercial trade shows, as well as print and web-based advertising.

4) Vogster has not granted Defendants any right, license, or assignment to use any of its marks, websites or domain names;

5) previously, Defendants did not personally use the Vogster websites or domain names in connection with the bona fide offering of any goods or services; and

6) Defendants have transferred and continue to transfer registration rights to the Vogster websites or domain names to or between themselves and unknown parties, despite fair notice of Vogster's legal claims to the exclusive use of such marks, websites and domain names.

Under the circumstances here, it is unlikely that Defendants can advance any legitimate purpose for their current ownership or control of Vogster websites and domain names.[6] See, e.g., Kuklachev, 2009 WL 497628, at *21; Freedom Calls, 2006 WL 845509, at *13-14; Ace Mortgage Funding, LLC v. Bradford, No. 1:06-CV-146, 2008 WL 687314, at *5-7 (S.D. Ind. Mar. 10, 2008). Accordingly, the showing necessary to establish a likelihood of success on the merits sufficient to warrant a temporary restraining order is satisfied.

b. Breach of Contract and Breach of Fiduciary Duty

In addition to likely establishing ACPA liability against Defendants, Vogster is likely to prevail on its common law claims against Mostovoy. The evidence presented indicates that on February 6, 2009, Vogster and Mostovoy entered into a series of agreements, whereby Mostovoy

---

[6] Among the non-exclusive factors for determining bad faith is whether the defendant has misused or misappropriated the mark for commercial gain or defamatory motives. See 15 U.S.C. § 1125(d)(1)(B)(V). In this case, there is, as yet, no indication from the record that Defendants have made any actively malicious use of their access to the Vogster websites or domain names, either to divert Vogster's customers, to disparage the Company, or to otherwise profit from their exclusive control over the Vogster websites or domain names. Compare Kuklachev, 2009 WL 497628 at *14 (alleging use of domain name to actively advertise infringing performance); Bridges Network, 1006 WL 145912 at *3 (finding that defendants were using plaintiff's marks in the advertising of competing goods and services). Nonetheless, a sufficient inference of bad faith may be had based on Defendants' ostensible lack of any good-faith basis for retaining the Vogster domain names; the inherent bad faith in Mostovoy's initial registration of Vogster's domain names in his personal name, rather than in the Company's name; Mostovoy's transfer of registration rights to third parties, including Vaysman; the acrimony between Vogster and Mostovoy arising from the underlying circumstances of Mostovoy's departure; and the clearly disruptive potential that Defendants' access and control affords them. See Freedom Calls, 2006 WL 845509 at *13 (finding bad faith in defendants' possession of plaintiff's domain names even in the absence of commercial use, diversion, or defamatory use, stating "the Court does not naively believe, given the acrimony between [the parties] that there is no possibility that either situation [defamatory or commercial misuse] could occur in the very near future. In light of these considerations, the Court finds that Defendant, most likely created the ... [d]omain and [w]ebsite with a bad faith intent to divert users from Plaintiff's website to its own.").

9

agreed to deliver to Vogster any and all intellectual property, including, but not limited to, the Vogster websites and domain names. Section 1.7 of the Sale Purchase Agreement reads, in pertinent part, as follows:

> Entire Interest. The Sale Interests sold, assigned and transferred under this Agreement represents Seller's entire interest in the Company. They include, but not limited to any and all my proprietary rights of the member of the Vogster Entertainment, L.L.C. to any and all current and possible future company's property and/or products and/or services, proprietary rights and financial interests in any and all company's current and future (to be developed) domains, e-mail addresses, websites products, publishing products, trade marking rights such as CRIMECRAFT, VOGSTER etc., associated in any and every way with the Company's operations, current and future products and services whatsoever; which will be sold, delivered and/or transferred to the Company under this Sale Purchase/ Agreement.

At this stage, the Court sees nothing ambiguous in the parties' intention that Mostovoy divest himself of any and all of Vogster's intellectual property, including any interest he might have had in the Vogster websites and domain names. Nor is there any indication on the present record that there exists any viable defense to the strict enforcement of that agreement in accordance with its clear and unambiguous terms. Thus, because this Court finds that Mostovoy's retention of ownership/registrant rights in the Vogster websites and domain names is likely violative of his contractual obligations, likelihood of success on Vogster's breach of contract claim is established.

Finally, in light of Mostovoy's previous status as co-owner of Vogster, this Court finds that any bad-faith action in unlawfully registering Vogster's intellectual property to himself, as was apparently done here, would likely give rise to successful claims for breach of fiduciary duty. See Freedom Calls, 2006 WL 845509 at *16-17.

Although it applied New York (rather than New Jersey common law), the Court in Freedom Calls, supra, likewise found a likelihood of success on the plaintiff's breach of

fiduciary duty claim in circumstances similar to those here. See Freedom Calls, 2006 WL 845509 at *16-17 (issuing § 1125(d) preliminary injunctive relief against defendant). There, the defendant, a former director of the non-profit plaintiff Freedom Calls Foundation, created and registered the plaintiff's website, www.freedomcalls.org. Unbeknownst to the Organization, however, the defendant also registered a separate domain in his own name: www.freedomcalls.us, which domain name he began to utilize following his acrimonious termination from the Organization. Finding a likely breach of the defendant's continuing fiduciary duty to the plaintiff, the Court made clear that a former employee is "not free to exploit the same trade [as his former employer] if the opportunity was facilitated by acts of preparation and disloyalty during his employment and before his termination." Id. (internal citations omitted). This Court finds that reasoning equally applicable here.

## C. Irreparable Harm

In connection with ACPA cybersquatting claims, irreparable harm may be presumed where there is a likelihood of success on the merits. See Freedom Calls, 2006 WL 845509 at *16-17. As stated above, Vogster has shown a likelihood of success. Even if irreparable harm were not presumed, however, it has been established here.

The basis for Vogster's claim of irreparable harm is that Mostovoy unlawfully possesses the "keys to the castle." By virtue of his status as the named registrant of the Vogster websites and domain names, and his exclusive access to the usernames and passwords necessary to assert control over those assets, it is possible for Mostovoy to immediately disrupt and even destroy Vogster's business. As stated in its submissions to this Court, Defendants have the ability to redirect the Vogster domain names to a website of their choice, or even to shut down Vogster's websites. The Defendants' control over the Vogster websites and domain names also enables

Defendants to effect control over Vogster's content on the servers hosting those websites and potentially to gain access to sensitive confidential or proprietary business information, including trade secret data and confidential personnel information.

More specifically, the potential for immediate harm is manifest in light of Vogster's imminent launch of its new "Unbound Saga" video game product. Disruption or diversion of any Vogster website related to this new and potentially valuable product during such a sensitive, nascent stage poses a considerable risk of irreparable harm.

The Court concludes that Plaintiff has demonstrated that a restraining order is necessary to prevent irreparable harm and that there is a likelihood of success on the merits of its claims.

## II.

## REGISTRARS AND HOST ENTITIES

Plaintiff also seeks restraint of the registrars and hosts of the Vogster websites and domain names, including internet domain name registrars and internet host servers: eNom, Inc. d/b/a Name-services.com., eNom.com, Name Cheap, Inc. d/b/a Registrar-servers.com, NameCheap.com, iGenii, Inc. d/b/a Majesticdns, Hostgator.com, LLC; and Register.com. Plaintiff fails to allege any claims against these entities in its Complaint, and fails to articulate any legal basis for such restraint in their papers or at the hearing. For these reasons, and those discussed at the hearing, this Court DENIES the request to restrain these entities.

# ORDER

Accordingly, it is hereby:

**ORDERED** that Defendants Mostovoy and Vaysman, their agents, or anyone acting at the direction of or in concert with Defendants or their agents are hereby restrained from:

a) Accessing, using, or transferring any of Vogster assets, including without limitation its intellectual property, which include, among other things, Vogster's marks, including without limitation "Vogster," "Robocalypse," "Crimecraft," and "Unbound Saga." (collectively, the "Vogster Marks"); the related websites for those marks, which include, but are not limited to: www.vogster.com, www.robocalypse.com., www.unboundsaga.com, and www.crimecraft.com (collectively, the "Vogster websites") and the following domain names: vogster.com; vogster.co.uk; vogster.info; vogster.mobi; vogster.net; vogster.org; vogster.org.uk; vogster.tv; vogster.us; vogsteraward.com; vogsterawards.com; vogster.biz; crimecraft.biz; crimecraft.co.uk; crimcraft.com; crimecraft.info; crimecraft.mobi; crimecraft.net; crimecraft.org; crimecraft.org.uk; crimecraft.tv; crimecraft.us; crimecraftgame.com; robocalypse.com; robocaplypse.us; robocalypsegame.com; unboundsaga.com; and helldiver.com (collectively, the "Vogster domain names");

b) Holding themselves out as officers, members, shareholders, employees, representatives or agents of Vogster;

c) Conducting any business on behalf of Vogster or doing anything to disrupt or interfere with Vogster's use of the Vogster domain names or the Vogster websites;

d) Directly or indirectly transferring ownership of or control over the domain name registrations for the Vogster domain names;

e) Directly or indirectly taking any action or giving any direction to the registrar companies that registered the Vogster domain names, including without limitation eNom.com, NameCheap.com and Register.com;

f) Directly or indirectly taking any action or giving any direction to the hosting companies that host the Vogster domain names and/or the Vogster websites, including without limitation: Hostgator.com, LLC; iGenii, Inc. d/b/a Majesticdns; Name Cheap, Inc. d/b/a Registrar-servers.com; and eNom, Inc. d/b/a Name-services.com (collectively, the Vogster Hosts"), regarding the Vogster domain names or the Vogster Websites, including without limitation the use, access, and/or content of the Vogster Websites;

g) Using the Vogster Marks or any colorable imitation thereof in connection with the offering, selling, advertising or promoting the sale of any goods or services or from otherwise using the Vogster Marks or any marks confusingly similar thereto;

h) Registering, transferring or using any domain names that contain marks that are likely to cause confusion with the Vogster Marks; and it is further

**ORDERED** that this Order is binding on Defendants Mostovoy and Vaysman, their agents and anyone acting at the direction of or in concert with Defendants or their agents

provided they receive actual notice of this Order by personal service or otherwise; and it is further

**ORDERED** that, pursuant to Federal Rule of Civil Procedure 65(c), this Order shall be effective upon Plaintiff's posting of security or bond in the amount of $10,000.00; and it is further

**ORDERED** that this Order will expire ten days after entry unless further extended by Order of this Court or by Defendants' consent; and it is further

**ORDERED** that, on two days' notice to Plaintiff, persons enjoined by this Order may appear and move to dissolve or modify the Order; and it is further

**ORDERED** that his Order, together with the Complaint and all papers supporting Plaintiff's motion for Temporary and Preliminary Injunctive Relief, shall be served upon Defendants in accordance with the requirements of service provided in the Federal Rules of Civil Procedure and the Local Rules for the Eastern District of New York, and it is further

**ORDERED** that service is to be effected no later than March 18, 2009, with proof of same to be filed electronically with the Court no later than March 19, 2009; and it is further

**ORDERED** that Defendants Mostovoy and Vaysman shall Show Cause, at a hearing to be held before the Undersigned on March 26, 2009 at 11:00 AM in Courtroom 6N, Fourth Floor, North Wing of the United States District Courthouse for the Eastern District of New York, 225 Cadman Plaza East, Brooklyn, New York, why the temporary restraints issued herein should not convert to a Preliminary Injunction, further enjoining Mostovoy, Vaysman and anyone acting in concert with them, pending final judgment in this action; and it is further

**ORDERED** that should Defendants Mostovoy and Vaysman, wish to file answering papers on the Order to Show Cause, they shall be filed and served no later than March 23, 2009,

upon attorneys for Vogster, Sills Cummis & Gross P.C., One Rockefeller Plaza, New York, New York 10020, Attn: Mark Rosenberg, Esq.; and it is further

**ORDERED** that Vogster may file and serve Reply papers, if any, no later than March 25, 2009; and it is further

**ORDERED** that this temporary restraining order is entered this 16th day of March, 2009 at _12:30_ am/(pm.)

SO ORDERED.

Dated: Brooklyn, New York
March 16, 2009

ROSLYNN R. MAUSKOPF /j.v.
United States District Judge